IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CRYSTAL DIXON,

                Plaintiff,              Case No. 3:08 CV 2806

-vs-

                                      MEMORANDUM OPINION

UNIVERSITY OF TOLEDO, et al.,

                Defendant.

KATZ, J.

This matter is before the Court on the cross Motions for Summary Judgment of Plaintiff Crystal Dixon (Doc. No. 60) and Defendants William Logie and Lloyd Jacobs (Doc. No. 71). The Court notes federal question jurisdiction under 28 U.S.C. §1331 and proper venue under 28 U.S.C. §1391. For the reasons stated below, Defendants' motion will be granted and Plaintiff's motion will be denied

## I. BACKGROUND

At the beginning of 2008, Plaintiff was the interim Associate Vice President for Human Resources for all campuses at the University of Toledo. She had previously served as the permanent Associate Vice President for Human Resources for the Health Science Campus. Under either position, she reported directly to Logie, the Vice President of Human Resources and Campus Safety, and to[1] Jacobs, the University President. On April 15, 2008, Logie prepared paperwork to present to Jacobs to make Plaintiff's position over all campuses permanent.

As Associate Vice President for Human Resources, Plaintiff was an "appointing authority" at the University, which means she had the power to hire and fire employees. Her work reviews

---

[1] There is some disagreement with regard to whether this was direct or indirect, but the Court need not address that.

from Logie had always been positive and praised her in the area of diversity.  Logie clearly knew of her views on homosexuality due to an interoffice memo she had written years earlier.

The University had an Equal Opportunity Policy which prohibited discrimination based on sexual orientation.  Further, the University has taken explicit steps to reach out to homosexuals and make them feel welcome.

On April 4, 2008, the *Toledo Free Press* ran an opinion by Michael Miller which Plaintiff felt compared the modern movement toward increased tolerance and rights for homosexuals to the historical struggles of the African-American civil rights movement and which noted that one University of Toledo campus offered domestic partner benefits and the other did not.  Due to her religious conviction, Plaintiff, an African-American woman, felt the need to respond.  The *Toledo Free Press* ran her response on April 18, 2008.  In it she objected to the idea that homosexuals are "civil rights victims," asserted that homosexuality is purely a choice, and noted that the inter-campus benefits disparities involved all employees, not just those interested in domestic partner benefits.  Plaintiff identified herself as "an alumnus of the University of Toledo's Graduate School, an employee and business owner" and signed only her name, though she used her University photograph.  She did not mention her title or duties within the University.  Since she intended to write as an unaffiliated citizen, she did not tell her superiors that she was writing an opinion or present it to them for approval.

Because of the response to her article, Plaintiff was immediately placed on administrative leave.  However, the University could not proceed at that time because Jacobs was out of the country.

In early May, shortly after he returned, the *Toledo Free Press* ran an opinion by Jacobs in which he repudiated Plaintiff's opinion on the behalf of the University and noted the University's stance on diversity. He also noted Plaintiff's position within the University. On May 5, 2008, Jacobs held a disciplinary hearing concerning Plaintiff's actions. Logie was not present. She appeared and read a statement, which she also distributed to those attending. In that statement Plaintiff did not state that her opinion had been misinterpreted, but claimed that she had never discriminated based on sexual orientation, noted the treatment and behavior of others (including Logie), and complained about the response her opinion had generated from the public and media. On May 12, she received a letter from Jacobs dated May 8, terminating her employment.

Plaintiff filed this suit against Logie, Jacobs, and the University. Her claims against the University and for equal pay discrimination have been dismissed or dropped. She and Defendants have cross-moved for summary judgment on her remaining claims: First Amendment Free Speech Retaliation and Fourteenth Amendment Equal Protection alleged against Logie and Jacobs in their individual and official capacities.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

3

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)). The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006); *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

4

*Williams*, 154 F. Supp. 2d at 1071; *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004) . The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### III. ANALYSIS

The primary issue presented by this case is the distinction between how a government entity relates to its employees and how it relates to citizens in general.  The Supreme Court has long held that, though "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment ... the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Connick v. Myers*, 461 U.S. 138, 140 (1983) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Thus, Plaintiff's reliance on arguments relating to sovereign authority is unavailing.  *See Waters v. Chruchill*, 511 U.S. 661, 674 (1994) ("constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign").

In addition, Plaintiff repeatedly emphasizes her religion.  However, she never alleged a claim of violation of either her Free Exercise rights or her Establishment rights.  Thus, the Court will only consider her Free Speech and Equal Protection claims.

*A. Freedom of Speech Claim*

5

In a First Amendment Free Speech employment retaliation claim filed under 42 U.S.C. § 1983, a plaintiff must show that the speech was constitutionally protected, that the retaliation at issue would deter an individual of "ordinary firmness," and that the speech motivated the employer's "retaliation." *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010) (citations omitted). Whether a plaintiff's speech is protected is a purely legal question for the Court to decide. *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350-51 (6th Cir. 2010) (citations omitted). This question is further parsed into three elements: a plaintiff must show that the speech involved "matters of public concern," that the state employer's interest "'as an employer, in promoting the efficiency of the public services it performs through its employees' ... [does] not outweigh [plaintiff's] desire to 'contribute to public debate' like any other citizen," and that the speech was not made "pursuant to" the duties of plaintiff's employment. *Evans-Marshall*, 624 F.3d at 337-38 (quoting *Pickering*, 391 U.S. at 568-73). In weighing the government interest as employer, the Court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S. at 570-73). While the balancing factor incorporates the level of public concern as weight for Plaintiff, Defendants need not have "allow[ed] events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.

Defendants present three theories justifying Plaintiff's termination in the face of her free speech rights. They argue that she spoke pursuant to her job duties, that she occupied a position

6

demanding special loyalty, and that the University's interest outweighed her interest in saying what she said; they do not contest any of the other elements. Two of these theories are highly persuasive.

First, the Court will consider Defendants' theory based on the most recent permutation of the law on free speech for government employees: the First Amendment does not prohibit discipline for speech made "pursuant to official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). Defendants support this theory by arguing that Plaintiff depended on her job to support her opinion. However, they do not argue that Plaintiff's job required that she write her article, a situation which may be clearly contrasted with Jacobs' article.

Essentially, Defendants' theory expands "pursuant to official responsibilities" to "in relation to official responsibilities." The Sixth Circuit has already rejected a similar expansion in *Westmoreland v. Sutherland*, 622 F.3d 714 (6th Cir. 2011). In that case, an off-duty firefighter appeared at a public meeting, identified himself as a Fire Department employee, and railed against a policy regarding the Fire Department. *Id.* at 716-17. The Sixth Circuit held that merely identifying himself as a public employee and speaking regarding his public employment did not place the firefighter's speech within the *Garcetti* test. *Id.* at 719. To satisfy that test speech must be "made pursuant to a task that was within the scope of his official duties" rather than merely in regard to such official duties. *Id*.

Here, there is factual dispute over whether Plaintiff identified herself to the same extent as the firefighter in *Westmoreland*, but Defendants have not presented any job duty she was attempting to satisfy. Indeed, the evidence clearly demonstrates that Plaintiff was not attempting to fulfill any job duty in writing her article, but to present a personal opinion. Even if she

7

attempted to give herself credence with the public by identifying herself, this does not satisfy the *Garcetti* test. Thus, Defendants' theory that Plaintiff spoke pursuant to her job duties does not defeat her First Amendment claim.

Defendants present two arguments concerning the balancing factor. First, they argue that Plaintiff's specific authority automatically tips the balance in their favor. Second, they assert the specific weights and balances presented by this case demonstrate that the University's interest outweighs Plaintiff's.

The first argument relies on the Sixth Circuit's statement that when certain employees "speak on job-related issues in a manner contrary to the position of [their] employer" they have been insubordinate and a presumption arises that the balance weighs in the favor of the employer. *Rose v. Stephens*, 291 F.3d 917, 923 (6th Cir. 2002). Thus, "when an employee is in a policymaking or confidential position and is terminated for speech related to his or her political or policy views, there is a presumption that the *Pickering* balance favors the government." *Silberstein v. City of Dayton*, 440 F.3d 306, 319 (6th Cir. 2006) (citing *Rose*). In determining whether this exception applies to a particular situation, the Sixth Circuit directs the use of the four categories describing permissible political patronage employment actions set forth in *McCloud v. Testa*, 97 F.3d 1536 (6th Cir. 1996). *Rose*, 291 F.3d at 924. If a position falls within one of the categories, the presumption in favor of the employer automatically applies. *Id.*

The first category includes "positions specifically named in relevant federal, state, county or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted." *McCloud*, 97 F.3d at 1557. Category two includes "positions to which a significant portion of the total discretionary authority

8

available to category one position-holders has been delegated." *Id.*  The third category consists of "confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, [and] other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors." *Id.*  The forth category relates to politically balanced positions. *Id.*  A position may still be sufficiently "confidential" or "policymaking" for the *Rose* presumption to apply without fitting into one of the four categories. *Silberstein*, 440 F.3d at 319.  Finally, in considering the four categories, the Court must focus on the duties inherent in the position. *Id.*

Defendants assert that Plaintiff's position as Associate Vice President for Human Resources fits into either category two or three.  Plaintiff responds with her Declaration which states that she was not delegated "significant" policy making authority and did not spend a "significant" amount of time advising Defendants.  She concludes that she was a ministerial employee.  While the contours of any delegation or time spent advising may be factual questions, whether any delegation or time spent are "significant" is a question of law for the Court.

Notably, Plaintiff's Declaration does not mention appointing authority.  The Board of Trustees is charged, by Ohio law, with governing the university.  O.R.C. §124.14(F).  Thus, it falls within category one.  At the time Plaintiff was fired, the Board had adopted a policy delegating appointing authority to four specific positions, in addition to the President; Plaintiff's position was listed and Logie's was not.  Further, not only did Plaintiff testify that she was responsible for employment decisions such as hiring and firing, but Ohio law states that all appointing authorities have that power.  O.R.C. §124.01(D).  Jacobs testified that he had been directly involved in only a

9

handful of terminations. Any delegation of the ability to hire and fire is clearly significant, especially due to the possibility of employment related lawsuits. Plaintiff does not present anything to restrict the import of her appointing power and instead focused on Jacobs' control of written policy. As such, the Court concludes that Plaintiff was vested with a significant portion of the statutory authority available, placing her within category two.

Even though Plaintiff fell within the second *McCloud* category, the presumption of insubordination will only apply if her statement related her policy view on a matter related to her employment. Plaintiff stated that she did not think homosexuals were civil rights victims. Not only does this statement directly contradict the University's policies granting homosexuals civil rights protections (such as the Equal Opportunity Policy), but as an appointing authority, Plaintiff was charged with ensuring that the University maintained those protections in employment actions. Thus, the *Rose* insubordination presumption applies. Plaintiff has offered nothing more than her claim that she "was never insubordinate to anyone" without any justification for why that would overcome (or even address) the presumption. Because the presumption holds, the balance of employee and employer concerns automatically tips in the employer's favor.

Defendants further argue that even if the *Rose* presumption does not apply, the actual weighing of employee versus employer interests in this case would clearly favor them. Plaintiff counters by asserting that her speech should be afforded the greatest protection.

In demonstrating the employer's interests in this case, Defendants again emphasize Plaintiff's position. As such, they emphasize her authority over employment actions and further note that even she has testified that she was serving as "an ambassador" for the University. Given her position, her statements against the rights of homosexuals could have done very serious

10

damage to the University in three ways (all of which Defendants cited and stated multiple times, including in the termination letter). Though all three may be speculative and concern only what might happen, as noted above, the law does not require Defendants to wait for damage to occur. *Connick*, 461 U.S. at 152; *see also Waters*, 511 U.S. at 673 ("we have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large").

First, her statements could disrupt the Human Resources Department by making homosexual employees uncomfortable or disgruntled. Though it did not enter into the actual consideration, Erich Stolz's letter[2] to Defendants clearly demonstrated that effect: he stated that her letter not only made him individually uncomfortable, but it also reduced his respect for her professionalism. Plaintiff responds that mere offense is insufficient to justify her termination. That might be an appropriate response to Defendants' offense, but it does not address loss of cohesion in the Human Resources Department as a legitimate interest of her employer. *See Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006) (disruption of workplace rejected when it merely concerned difference of opinion with superiors on subject unrelated to work done). Further, this addresses only the least of the three feared effects.

Second, Plaintiff's public statements could have interfered with the University's interest in diversity. Because of her statements, homosexual prospective employees might reconsider applications they knew she would review or withdraw them altogether. This concern removes a significant portion of Plaintiff's rebuttal that she has only acted fairly because she has not

---

[2] Plaintiff's objection to consideration of Stolz's opinion as improper opinion (Doc. No. 76 at 15 n.9) is overruled because his lay opinion as to how he felt is exactly what he is qualified to offer.

demonstrated how any applicants would know. Plaintiff also complains about consideration of the value of diversity as opposed to focus on teaching capacity alone. However, not only is that an overly simple description of the University's interest, any decrease in the capability of the University workforce could have an impact on instruction. *See City of San Diego v. Roe*, 543 U.S. 77, 81 (2004) ("proper functioning" a legitimate interest of police force, not merely law enforcement). If fewer qualified people apply, because some are homosexuals who know that the head of Human Resources (Plaintiff) does not think they deserve civil rights, then it could be that the quality of the eventual workforce will decline. Further, Plaintiff has not rebutted the concept that diversity itself (even with regard to non-faculty positions) improves the teaching function.

Third, as the termination letter stated, Plaintiff's public position could lead to challenges to her personnel decisions. In other words, Defendants feared lawsuits from homosexuals alleging sexual orientation or sexual harassment discrimination. This fear is clearly appropriate as her statement could be offered in a suit for either direct evidence of discrimination or for evidence of pretext (in rebuttal to a non-discriminatory reason). Further, Plaintiff's article could also lead to additional suits and grievances as people realize they may have a claim or the statement could be just enough to cause someone to decide to sue who otherwise might not have undertaken the expense and effort. Thus, Plaintiff's statements could subject the University to significant expense through more litigation or more difficult litigation (or other employment action challenges).

In response to these concerns, other than by emphasizing the value of her speech, Plaintiff primarily relies on the prior knowledge of her opinions and her history of behaving in a non-discriminatory manner. Neither of these actually addresses concerns over how others will react to

Plaintiff, especially since her claims relate to facts which are not public.[3] In other words, contrary to her assertion, she was not terminated due to Defendants discovering her views, but due to the public discovering them. While Plaintiff argues that the cause for her termination is at least a disputed fact, she has presented no evidence that Defendants actually relied on their discovery of her belief (other than to present differential treatment more appropriately characterized and addressed below under Equal Protection).

Next, Plaintiff claims that her article stated that she did not discriminate. Though she may have intended to imply this with some of her religious statements, her article never states that people should be treated without discrimination. Further, she claims that her article was merely meant to refute the comparison between historical racial and gender civil rights struggles and modern sexual orientation struggles. However, her article is far from clear on these points: she objects to homosexuals as "civil rights victims," not directly to the comparison of the movements. At her disciplinary hearing she had the opportunity to claim that she had been misunderstood and instead chose to defend her speech, claim that she did not discriminate, and complain about the complaints. Those very complaints she protested should have alerted her to the fact that it was not perceived as though she had said that she did not discriminate or that she was merely contrasting historical movements, yet she did not suggest that such perceptions were inaccurate, instead calling them intolerant. She cannot inject now what she had the opportunity to clarify then.

Plaintiff then invokes academic freedom. However, her speech "was not related to classroom instruction and was only loosely, if at all, related to academic scholarship" and thus

---

[3] While Plaintiff asserts that her previous statements could have been available to a public request, this does not compare to her article, most notably in that it requires active, rather than passive, search for information concerning her. It also provides no defense against the litigation concern.

deserves no extra protection. *Savage v. Gee*, –F.3d–, 2012 WL 10967 at *6 (6th Cir. 2012). Further, Plaintiff did not even have any responsibilities related to classroom instruction or academic scholarship. Thus, this claim adds no weight to her interests.

Finally, Plaintiff claims that her termination impedes diversity. She claims that accepting Defendants' employer interest arguments would prevent any conservative Christians from holding managerial positions at the University of Toledo. Plaintiff's claim is far too broad in two important ways. First, Defendants' arguments only restrict those who cannot hold their tongues about their beliefs (or fail to submit their beliefs anonymously). Plus, the position would likewise restrict liberal atheists as well. Second, Plaintiff ignores that Defendants' arguments are very specific to her position at the top of the Human Resources Department with only one person between her and the President.

Thus, the balance of Plaintiff's interest in making a comment of public concern is clearly outweighed by the University's interest as her employer in carrying out its own objectives. Therefore, Plaintiff has failed to establish that her speech was protected.

Plaintiff also claims that she was fired for violating an impermissibly vague speech policy. However, the damage she did to her ability to perform her job and to the University provide ample justification for her termination. Further, these reasons are supported by uncontradicted evidence as to the actual motives behind her termination, rather than speculation as to Jacobs' respect for the First Amendment or Plaintiff's religion. Plaintiff's claim that she suffered a viewpoint based restriction fails for the same reasons.[4]

---

[4] Defendants correctly note that Plaintiff has not presented any law applying these principles to the employment, rather than sovereign, context. Further, "[t]hat certain messages may be more likely than others to have such adverse effects does not render *Pickering's* restriction on speech

Therefore, Plaintiff cannot establish that her termination violated her First Amendment rights. Thus, the Court will grant Defendants, and deny Plaintiff, summary judgment on the First Claim for Relief of the Second Amended Complaint.

*B. Equal Protection Claim*

The Second Claim for Relief in Plaintiff's Second Amended Complaint alleges violation of her Fourteenth Amendment Equal Protection rights because she was fired for expressing her view and others were not fired for expressing their views. Again, Plaintiff focuses on law that governs sovereign acts, rather than employment actions. However, "a plaintiff asserting a Fourteenth Amendment equal protection claim under §1983 must prove the same elements required to establish a disparate treatment claim under Title VII." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

One of the key elements Plaintiff must establish is that those she claims were treated differently were "similarly-situated" and engaged in similar conduct. *Id.* (citations omitted). In matters of employee discipline, this requires the same, or at least relevantly similar, conduct, supervisors, and standards for both the plaintiff and the "similarly-situated." *Id.* (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Plaintiff has not presented any sufficiently "similarly-situated" comparisons. She focuses primarily on Carol Breshnahan's statements to The Blade describing opponents of homosexual civil rights as "religious bigots." While this statement might be sufficiently similar conduct,

---

viewpoint based." *United States v. Nat'l Treasury Employees Union*, 413 U.S. 454, 467 n.11 (1995).

Breshnahan, a vice provost, was not "similarly-situated" to Plaintiff. Most notably, as vice provost, Breshnahan is a member of the faculty and thus subject to very different standards from those applicable to Plaintiff as an associate vice president. Further, Plaintiff, unlike Breshnahan, was responsible for hiring, firing, and discipline; while both Plaintiff's and Breshnahan's statements could have a perceived intolerance affect on recruitment and employment action challenges, due to perception of the speaker as biased against a particular group, only Plaintiff held responsibilities for which such charges could be relevant.

Plaintiff also refers to Jacobs' opinion piece in response to hers, an article by Samuel Hancock, and to the opinions of other faculty members which were critical of the University administration. Without regard to whether Jacobs' opinion piece was similar to Plaintiff's, Jacobs, as president of the University, clearly occupied a different position. Hancock's article is dissimilar because, unlike Plaintiff, he submitted it to Jacobs beforehand. Finally, the articles written by Renee Heberle and Donald Wedding fail as comparisons in the same way as Breshnahan's statements - due to their positions as faculty.

Plaintiff has not presented anyone who was "similarly-situated" and engaged in similar conduct. Therefore, without regard to any other element of her Equal Protection claim, it fails. Thus, the Court will grant Defendants, and deny Plaintiff, summary judgment on the Second Claim for Relief of the Second Amended Complaint.

*C. Additional Defenses*

Defendants raise two additional defenses: qualified immunity for both Defendants for claims against them in their individual capacity and Logie's lack of involvement in Plaintiff's termination. The defense of qualified immunity challenges a plaintiff to both show a violation of a

constitutional right and that the right was "clearly established" at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). Because Plaintiff has failed to demonstrate that her constitutional rights were violated, the Court need not consider whether such rights were "clearly established" at the time of her termination.

Logie claims to have had neither the ability nor any actual hand in Plaintiff's termination. Without regard to whether there is a sufficient disagreement on Logie's ability to fire Plaintiff at that time, Plaintiff has presented no evidence that Logie had any input in Jacobs' decision to terminate her. In fact, Defendants' story that Logie was excluded from any such consideration is undisputed, other than, perhaps, by argument of counsel.

## IV. CONCLUSION

For the reasons discussed herein, Defendants' Motion for Summary Judgment (Doc. No. 71) is granted and Plaintiff's Motion for Summary Judgment (Doc. No. 60) is denied. Case closed.

IT IS SO ORDERED.

                s/ *David A. Katz*
                DAVID A. KATZ
                U. S. DISTRICT JUDGE